**NORTH PENN TRANSFER, INC.,**
**Debtor–In–Possession,**
**Plaintiff,**

v.

**VICTAULIC COMPANY OF**
**AMERICA, Defendant.**

**Civ. A. No. 94–0850.**

United States District Court,
E.D. Pennsylvania.

July 5, 1994.

---

Ronald Amato, Bethlehem, PA, for plaintiff.

James W. Patterson, Philadelphia, PA and Paul J. Lamboley, Washington, DC, for defendant.

### OPINION AND ORDER

VAN ANTWERPEN, District Judge.

This case presents a recurring question of late, namely whether an interstate motor carrier in bankruptcy can recover undercharges based on tariff rates filed for interstate commerce transportation notwithstanding the lower rates actually collected prior to the carrier's bankruptcy. Plaintiff North Penn Transfer, Inc. ("North Penn Transfer"), a debtor-in-possession, brought this suit against defendant Victaulic Company of America ("Victaulic") to recover $71,752.75 in alleged freight undercharges, plus interest and costs. Defendant filed an answer and counterclaims. This matter is currently before the court on plaintiff's motion to strike defendant's affirmative defenses and two counts of defendant's counterclaims, specifically claims of misrepresentation and abuse of process. Jurisdiction is based upon the Interstate Commerce Act. *See* 49 U.S.C. §§ 10741(a), 10762.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This action arises out of a relationship between North Penn Transfer and Victaulic in which North Penn Transfer transported property on behalf of Victaulic on numerous occasions between the dates of February 1989 and February 1992. Complaint, Exhibit "A". The carriage was allegedly subject to the provisions of the Interstate Commerce Act ("ICA"), 49 U.S.C. § 10101, *et seq.* North Penn Transfer filed tariffs with the Interstate Commerce Commission ("ICC") as required by 49 U.S.C. § 10762(a) and therein set forth the applicable rates for different services. The rates germane to the freight services North Penn Transfer provided on behalf of Victaulic were allegedly filed with the ICC. Complaint, ¶ 5.

On February 10, 1992, plaintiff North Penn Transfer filed a petition for bankruptcy un-

der Chapter 11 of the U.S. Bankruptcy Code. Complaint, ¶ 2. Subsequent to its Chapter 11 filing, the plaintiff initiated an audit of its shipments of defendant Victaulic's goods "to determine compliance with the published rates contained in the [interstate] tariffs [on file with the ICC]." Complaint, ¶ 7. As a result of this audit, the plaintiff claims to have discovered a discrepancy in its favor between the amount it actually collected from the defendant shipper and the amount allegedly due under the applicable tariff rates filed with the ICC. Complaint, ¶ 8. After failing to receive payment from the defendant for the difference it claimed it was owed, plaintiff initiated this suit on February 8, 1994, alleging that defendant remains indebted to the carrier because defendant has paid only a portion of the full amount due on its shipments.

In its answer, Victaulic asserts, *inter alia,* that its goods were transported pursuant to a tariff rate or an agreement that was less than the rate plaintiff now seeks to enforce and that it has therefore paid the entire freight bill. The defendant also claims that it was not subject to the filed tariff rates because North Penn Transfer was not a participating carrier regarding some of the tariffs or that the tariffs were not applicable to the deliveries that are the subject of this lawsuit for various different reasons. One of the basic reasons given is that North Penn Transfer shipped not as a common carrier but instead acted as a contract carrier. Amended Answer, p. 3. Therefore, defendant argues, plaintiff's prices were controlled by the terms of the parties' contract rather than the ICC tariff rates. *See* Defendant's Memorandum in Support of Opposition to Plaintiff's Motion to Strike Defendant's Affirmative Defenses and Counterclaims, pp. 1–2. Another claimed basic reason is that North Penn Transfer's filed tariffs are discriminatory or unreasonable and, therefore, unenforceable. Amended Answer, p. 3. Finally, defendant claims that the tariffs never became effective. Amended Answer, p. 4. Defendant's position is reflected in twelve affirmative defenses and three counterclaims.

Plaintiff, in response, filed the instant motion to strike defendant's affirmative defenses and two of its counterclaims. In this motion, the plaintiff maintains that it was not acting as a contract carrier when it transported property on behalf of Victaulic and, therefore, its prices were required by law to be consistent with the tariff rates on file with the ICC. *See* Plaintiff's Memorandum of Law in Support of Motion to Strike, pp. 4–9.

## II. STANDARD OF REVIEW FOR MOTION TO STRIKE UNDER RULE 12(F)

Rule 12(f) of the Federal Rules of Civil Procedure provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R.Civ.P. 12(f). "An affirmative defense is insufficient if it is not recognized as a defense to the cause of action." *Total Containment, Inc. v. Environ Products, Inc.,* No. 91–7911, 1992 WL 208981 at *1 (E.D.Pa., August 19, 1992).

"A court possesses considerable discretion in disposing of a motion to strike under Rule 12(f)." *River Road Devel. Corp. v. Carlson Corp.,* No. 89–7037, 1990 WL 69085 at *2 (E.D.Pa., May 23, 1990). Motions to strike, however, are "not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues." *Id., citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure* at 1382 (1969); *see also Cipollone v. Liggett Group, Inc.,* 789 F.2d 181, 188 (3d Cir.1986); *Glenside West Corp. v. Exxon Co., U.S.A., Div. of Exxon Corp.,* 761 F.Supp. 1100, 1115 (D.N.J.1991).

"Partly because of the practical difficulty of deciding cases without a factual record it is well established that striking a pleading should be sparingly used by courts. It is a drastic remedy to be resorted to only when required for the purposes of justice." *United States v. Consolidation Coal Co.,* No. 89–2124, 1991 WL 333694 at *1 (W.D.Pa., July 5, 1991). "[A] court should not grant a motion to strike a defense unless the insufficiency of the defense is 'clearly apparent'." *FDIC v. White,* 828 F.Supp. 304, 307 (D.N.J.1993), *quoting from Cipollone,* 789 F.2d at 188.

█ A motion to strike will not be granted where the sufficiency of a defense depends on disputed issues of fact. *United States v. Marisol, Inc.*, 725 F.Supp. 833, 836 (M.D.Pa.1989); *Linker v. Custom–Bilt Mach., Inc.*, 594 F.Supp. 894, 898 (E.D.Pa. 1984). Even when the facts are not in dispute, Rule 12(f) is not meant to afford an opportunity to determine disputed and substantial questions of law. *Heller Fin. Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1295 (7th Cir.1989); *Glenside West Corp.*, 761 F.Supp. at 1115; *Marisol, Inc.*, 725 F.Supp. at 837. Motions to strike save time and expense, however, by making it unnecessary to litigate claims which will not affect the outcome of the case. *See United States v. Kramer*, 757 F.Supp. 397, 410 (D.N.J.1991); *Consolidation Coal Co.*, 1991 WL 333694 at *1; *Marisol, Inc.*, 725 F.Supp. at 836.

█ Motions to strike are to be decided "on the basis of the pleadings alone." *Total Containment*, 1992 WL 208981 at *1. "An affirmative defense can be stricken 'only if the defense asserted could not possibly prevent recovery under any pleaded set or inferable set of facts.'" *Linker*, 594 F.Supp. at 898, *quoting from United States v. Pennsalt Chemicals Corp.*, 262 F.Supp. 101 (E.D.Pa. 1967).

## III. DISCUSSION

North Penn Transfer moves to strike all of the affirmative defenses asserted by Victaulic as well as two counts of its counterclaim.

Nevertheless, North Penn Transfer does not argue in detail against each affirmative defense Victaulic has raised, with the exception of the first and eleventh affirmative defenses dealing with the issues of contract carriage and the applicable statute of limitations period respectively. Instead, North Penn Transfer moves to strike the other affirmative defenses on the grounds that they are precluded by the filed rate doctrine.

## A. The Filed Rate Doctrine

█ The filed rate doctrine provides that a carrier receive from a shipper no more or no less than the tariff rate on file with the ICC. *See White v. United States*, 989 F.2d 643, 646 (3d Cir.1993). The purpose of the doctrine is to prevent rate discrimination and secret deals. Shippers, who have constructive notice of the filed rates, are liable for the full rate, and a carrier may institute an "undercharge action" to obtain the difference between the full filed rate and the lower rate originally paid by a shipper to the carrier. *See* 49 U.S.C. §§ 10761(a),[1] 11706(a)[2]; *Maislin Industries, U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990).

The U.S. Supreme Court dealt with one type of "undercharge claim" in *Maislin*. *Id.* In that case, a carrier had given to shippers unpublished discounts from the filed rate. When the carrier declared bankruptcy, the trustee attempted to collect the undiscounted part of the tariff. Upon referral from the

---

1. 49 U.S.C. § 10761(a) provides:

Except as provided in this subtitle, a carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter. That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device.

2. 49 U.S.C. § 11706(a) provides:

A common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter

105 of this title or a freight forwarder must begin a civil action to recover charges for transportation or service provided by the carrier or freight forwarder within 3 years after the claim accrues; except that a motor carrier (other than a motor carrier providing transportation of household goods) or freight forwarder (other than a household goods freight forwarder)—

(1) must begin such a civil action within 2 years after the claim accrues if the transportation or service is provided by the carrier in the 1–year period beginning on the date of the enactment of the Negotiated Rates Act of 1993; and

(2) must begin such a civil action within 18 months after the claim accrues if the transportation or service is provided by the carrier after the last day of such 1–year period.

bankruptcy court, the ICC applied a "negotiated rates" policy to opine that trustees could not rebill the filed rate for shipments originally billed at a lower, negotiated rate. *See Maislin,* 497 U.S. at 122–25, 110 S.Ct. at 2763–65. The Supreme Court held that the "negotiated rates" policy violated the ICA in that the policy applied an equitable defense to the filed rate doctrine where the Act did not permit one; the trustee's undercharge claims were therefore valid. *Id.* at 126–36, 110 S.Ct. at 2765–71.

■ Citing *Maislin,* North Penn Transfer thus asserts that the court should strike Victaulic's affirmative defenses because certain equitable defenses like fraud or estoppel are unavailable for a shipper. *See, White v. United States,* 989 F.2d at 646 (ICA did not permit equitable defenses); *Missouri P. R. Co. v. Rutledge Oil Co.,* 669 F.2d 557 (8th Cir.1982) (fraud and estoppel unavailable); *Aero Trucking, Inc. v. Regal Tube Co.,* 594 F.2d 619 (7th Cir.1979) (estoppel defense precluded). The filed rate doctrine, however, does not automatically bar the assertion of affirmative defenses in an action for undercharges. Shippers may assert claims or defenses furnished by the ICA, for instance. *See Reiter v. Cooper,* —— U.S. ——, ——, 113 S.Ct. 1213, 1219, 122 L.Ed.2d 604 (1993). Accordingly, we will now review each of the affirmative defenses and two counts of the counterclaim asserted by the defendant shipper in this case.

## B. Victaulic's Affirmative Defenses and Counterclaims

### 1. *Contract Versus Common Carrier Status.*

■ The first affirmative defense offered by defendant asserts that North Penn Transfer acted as a contract carrier with respect to shipments made on behalf of Victaulic and, therefore, all Victaulic's shipments should be exempt from the filed rate doctrine. Defendant also contends that the resolution of the contract carriage and rate reasonableness issues should be referred to the ICC. In addition to citing the primary jurisdiction doctrine, discussed *infra,* defendant argues that the Negotiated Rates Act of 1993 ("1993 Rates Act"), Public L. No. 103–180, 107 Stat. 2044, dictates this result.

Section 8 of the 1993 Rates Act provides as follows:

> If a motor carrier ... has authority to provide transportation as a motor common carrier and a motor contract carrier and a dispute arises as to whether certain transportation is provided in its common or contract carrier capacity and the parties are not able to resolve the dispute consensually, *the Commission* shall have jurisdiction to, and shall, resolve the dispute.

49 U.S.C. § 11101(d) (West Supp.1994) (emphasis added). According to the plain language of this statute, it is clear that Congress intended for the contract versus common carriage issue to be reviewed initially by the ICC.[3] Therefore, we should allow the

---

**3.** Despite the explicit provisions in section 8 of the 1993 Rates Act regarding the jurisdiction of the ICC over the issue of contract versus common carriage, plaintiff argues that section 541(c)(1) of the United States Bankruptcy Code, 11 U.S.C. § 541(c)(1), conflicts with the jurisdictional provisions of the 1993 Rates Act and therefore prevents the referral of this issue to the ICC. Section 541(c)(1) provides in relevant part:

> An interest of the debtor in property becomes property of the estate ... notwithstanding any provision in an ... applicable nonbankruptcy law—
> (A) that restricts or conditions transfer of such interest by the debtor; or
> (B) that is conditioned on the insolvency or financial condition of the debtor ... and that affects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 541(c)(1). Plaintiff argues that because it is a Chapter 11 debtor under the jurisdiction of the United States Bankruptcy Court, the Bankruptcy Court maintains jurisdiction over the causes of action on file by the debtor and that Section 541(c)(1) prevents the application of the jurisdictional provisions of the 1993 Rates Act. *See In re Bulldog Trucking, Inc.,* Fed.Carr.Case (CCH) P 83,841, 1993 WL 367623 (Bankr. W.D.N.C.1993).

We reject plaintiff's contention that its status as a bankrupt debtor prevents the application of the 1993 Rates Act. Numerous courts which addressed this issue have not only interpreted the 1993 Rates Act to apply to bankrupt carriers, but have found that Congress specifically designed the 1993 Rates Act to solve the problems caused by the explosion of carrier undercharge litigation brought by bankrupt carriers. *See e.g., Jones Truck Lines v. Grinnell Corp.,* 167 B.R. 488, 493 (N.D.Ill.1994) (holding that Congress intended

ICC to decide the question of whether North Penn Transfer, in transporting Victaulic's shipments, acted as a common or contract carrier.[4]

### 2. Rate Reasonableness.

Victaulic's third affirmative defense is based on the alleged unreasonableness of North Penn Transfer's filed tariff rates. Defendant argues in its third defense that even if the ICC or the court finds that plaintiff carrier acted as a common carrier, plaintiff may not enforce its filed tariff rates because they are unreasonable.

In *Maislin*, the Supreme Court recently restated the principle that the filed rate doctrine contains an important caveat: the filed rate is not enforceable if the ICC finds the rate to be unreasonable. 497 U.S. at 128, 110 S.Ct. at 2766. North Penn Transfer argues in this case that a defendant shipper in an undercharge case cannot raise rate reasonableness as a defense. The federal courts of appeal had split on this issue, with a majority holding that a shipper may assert rate reasonableness as a defense in an undercharge action brought by a carrier. *See Delta Traffic Service, Inc. v. Transtop, Inc.*,

the 1993 Rates Act to apply to bankrupt debtors); *Lewis v. H.E. Wisdom & Sons, Inc.*, No. 93 C 0985, 1994 WL 110659, at *4–5 1994 U.S. Dist. LEXIS 3962, at *16–19 (N.D.Ill., March 30, 1994) (concurring with the reasoning of other federal courts that clear intent of Congress is to have the 1993 Rates Act apply to bankrupt carriers); *Jones Truck Lines, Inc. v. Alliance Rubber Co.*, 166 B.R. 691, 691–93 (W.D.Ark.1994) (after reviewing the legislative history of the 1993 Rates Act, concluding that Congress passed the Act in response to undercharge claims made by bankrupt carriers).

This court is aware that United States Bankruptcy Judge Marvin Wooten of North Carolina does not concur with the construction of the 1993 Rates Act as presented in the above cases, which we adopt today. We believe, however, that Judge Wooten's recommended construction and plaintiff's adoption of that position in the case at bar are based upon an incorrect analysis of the statute. The court instead concurs with the assessment of Judge Hendren in *Jones Truck Lines v. Alliance Rubber*: "The Court recognizes the apparent conflict between the language of the bankruptcy statute quoted above and the legislative history of the [1993 Rates Act] but believes one of the main purposes of the [1993 Rates Act] was to make an impact on the number of lawsuits brought by trustees in their capacities as representatives of bankrupt estates." 166 B.R. at 693. The 1993 Rates Act's legislative history and the statute's plain language make it clear to the court that Congress intended the statute to apply to bankrupt carriers.

We find no irreconcilable difference between the Bankruptcy Code provisions and the 1993 Rates Act. Contrary to plaintiff's contentions, it is not the financial condition of the carrier that triggers the termination of property interests, it is the retroactive application of the 1993 Rates Act that affects such interests. We agree with the court's reasoning in *In re Best Refrigerated Express, Inc.*, 168 B.R. 978, 984–85 (Bankr. D.Neb.1994). In passing the 1993 Rates Act, Congress has redefined non-operating carriers' property rights (that is, the right to pursue undercharge claims) and has imposed its new definition to alter already existing property rights

without regard to a carrier's financial condition. This issue is not related to section 541(c)(1) of the Bankruptcy Code, which provides that the debtor has certain property rights notwithstanding nonbankruptcy statutory language that purports to limit such rights based upon the financial condition of the debtor.

Finally, even if the court were to accept, in arguendo, the *Bulldog* court's interpretation and decide that the two statutes were irreconcilably in conflict, Judge Wooten's view would still come in conflict with another legal canon: the statute that is the more recent and specific, in this case the 1993 Rates Act, usually controls the earlier and more general statute. The expansive interpretation of the Bankruptcy Code urged by the court in *Bulldog* would invalidate the 1993 Rates Act's core provisions against bankrupt carriers, thus violating the fundamental principle of statutory construction that courts should harmonize the provisions of different statutes rather than nullifying one of them.

4. Title 28 of the U.S. Code, section 1336(b) provides in relevant part:

When a district court ... refers a question or issue to the Interstate Commerce Commission for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside, annul, or suspend, in whole or in part, any order of the Interstate Commerce Commission arising out of such referral.

However, the statute fails to add a specific procedure according to which a "referral" may properly be ordered. Thus, rather than ordering a referral, the court can only stay the instant proceedings in order to allow the parties to pursue administrative action. *See Reiter*, —— U.S. at ——, n. 3, 113 S.Ct. at 1220, n. 3 ("[T]he ICA (like most statutes) contains no mechanism whereby a court can on its own authority demand or request a determination from the agency; that is left to the adversary system, the court merely staying its proceedings while the shipper files an administrative complaint under section 11701(b).")

902 F.2d 101 (1st Cir.1990); *Duffy v. BMC Industries, Inc.*, 938 F.2d 353, 357–58 (2d Cir.1991); *Advance United Expressways, Inc. v. Eastman Kodak Co.*, 965 F.2d 1347, 1349 (5th Cir.1992); *Western Transportation Co. v. Wilson & Co.*, 682 F.2d 1227, 1231–32 (7th Cir.1982); *Atlantis Express, Inc. v. Standard Transp. Servs., Inc.*, 955 F.2d 529, 535–37 (8th Cir.1992); *Milne Truck Lines, Inc. v. Makita U.S.A., Inc.*, 970 F.2d 564 (9th Cir.1992). Only the Fourth Circuit held the unreasonable rate defense invalid and held that a shipper must pay the tariff rates first and then seek relief in a separate action for damages. *See In re Carolina Motor Express, Inc.*, 949 F.2d 107, 110–11 (4th Cir. 1991).

The Supreme Court recently reviewed the Fourth Circuit's decision and reversed it. *Reiter v. Cooper*, — U.S. —, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). The ICA requires carriers' rates to be "reasonable," section 10701(a), and gives shippers an express cause of action against carriers for damages in the amount of the difference between the tariff rate and the rate determined by the ICC. 49 U.S.C. § 11705(b)(3). The Supreme Court held that while it may be true in a technical sense that rate unreasonableness is not a defense, since section 11705(b)(3) provides a cause of action rather than a defense, a shipper could, and often must, assert that cause of action as a counterclaim to the carrier's undercharge action. The Supreme Court in *Reiter*, however, treated the shipper's unreasonable rate defenses as counterclaims because they related to the same shipments for which the carriers sought to collect the tariff rate. — U.S. at ——–——, 113 S.Ct. at 1215–19. The Court

held that the filed rate doctrine did not prohibit shippers from asserting by way of claim or counterclaim the rights explicitly conferred by section 11705(b)(3). *Id.* at ——–——, 113 S.Ct. at 1217–19. The Court then rejected the carrier's argument that payment of the tariff rate was a prerequisite to litigating the reasonable rate issue. The Court ruled that shippers may assert a claim under section 11705(b)(3) before payment, but after their shipments were delivered. *Id.* at ——–——, 113 S.Ct. at 1219–21.

Applying the *Reiter* decision to the facts of this case, we conclude that Victaulic has properly raised the unreasonable rate issue. Victaulic raises the unreasonable rate issue as both an affirmative defense and a counterclaim. Like the Supreme Court, however, and for the same reasons as stated in *Reiter*, this court will treat Victaulic's third affirmative defense as part of its counterclaim for damages pertaining to rate reasonableness under section 11705(b)(3). Victaulic's claim under section 11705(b)(3) is properly raised here, because it relates to the same shipments for which North Penn Transfer seeks to collect the filed rates. *Reiter*, — U.S. at ——–——, 113 S.Ct. at 1217–19. Under the holding of *Reiter*, Victaulic need not pay North Penn Transfer prior to resolving the unreasonable rate issue.[5]

### 3. *Applicability of the 1993 Rates Act.*

In addition to filing affirmative defenses and counterclaims, Victaulic also gave notice to the court that it intended to invoke the 1993 Rates Act's special election procedures for resolving claims of non-operating

---

**5.** Pursuant to the doctrine of primary jurisdiction, Victaulic has requested this court to refer the issue of the reasonableness of North Penn Transfer's filed rates to the ICC. To justify referral to the ICC under the primary jurisdiction doctrine, however, the shipper must make a threshold showing that the filed rates are unreasonable. *Branch Motor Express Co. v. Caloric Corp.*, No. 89–1130, slip op. at 4, 914 F.2d 241 (3d Cir.1990) (table only) (mere mention of rate reasonableness not sufficient to justify referral to ICC); *Atlantis Express, Inc. v. Standard Transp. Servs., Inc.*, 955 F.2d at 537; *F.P. Corp. v. Ken Way Transp., Inc.*, 821 F.Supp. 1032, 1038 (E.D.Pa.1993).

Victaulic, at this point in the litigation, has failed to produce any evidence indicating that plaintiff's tariff rates in effect at the time of the contested shipments were well above the alleged negotiated contract rates. Nor has defendant provided the court with evidence of the competitive rate levels generally available in the industry to compare with plaintiff's filed tariff rates. *See Horn's Motor Express v. Harrisburg Paper Co.*, 765 F.Supp. 211, 217 (M.D.Pa.1991). Therefore, we decline to exercise our discretion to allow the ICC to decide this issue pursuant to the primary jurisdiction doctrine. The mere allegation of unreasonable rates is insufficient for the court to act at this time.

carriers. 49 U.S.C. § 10701(f)(8)(A) (West Supp.1994). *See* Notice of Defendant's Election, June 9, 1994. The 1993 Rates Act amends 49 U.S.C. § 10701 by adding a new section (f) entitled: "Procedures for Resolving Claims Involving Unfiled, Negotiated Transportation Rates." 1993 Rates Act, section 2(a). Amended section 10701(f)(1)(A) makes clear that the dispute resolution procedures of the Rates Act apply to carriers that are no longer transporting property or are merely transporting property for the purpose of avoiding the application of the Rates Act. 1993 Rates Act, section 2(a). The Act also prescribes that "[i]f there is a dispute as to the showing [of whether the carrier continues to operate and if so for what reasons], such dispute shall be resolved by the court in which the claim is brought." 1993 Rates Act, section 2(a).

Victaulic has not presented evidence to show that North Penn Transfer has ceased transporting property and has not claimed that the carrier is operating only to avoid the application of the Act's alternative procedures. Accordingly, this court will not give effect to defendant's election and we decline, at this time, to allow the ICC to decide this undercharge dispute pursuant to the 1993 Rates Act's alternative dispute resolution procedures.

4. *Remaining Defenses and Counterclaims.*

 Victaulic's second, seventh, and eighth affirmative defenses largely challenge North Penn Transfer's elements of proof and raise interpretive issues pertaining to North Penn Transfer's various possible filed tariffs. These defenses do not present common law equitable defenses which Victaulic cannot assert. Tariff applicability or interpretation is a question of law to be decided by a federal court or by the ICC. *See Rebel Motor Freight, Inc. v. ICC,* 971 F.2d 1288, 1290–91 & n. 4 (6th Cir.1992) (tariff construction is question of law); *Carriers Traffic Serv., Inc. v. Toastmaster, Inc.,* 707 F.Supp. 1498, 1503 (N.D.Ill.1988) (court examined application of tariffs to various shipments). Whether the tariff was effective may be determined by the court as well. *See Freightcor Servs. Inc. v.*

*Vitro Packaging, Inc.,* 969 F.2d 1563, 1568 (5th Cir.1992) (declaring a tariff void as a matter of law), *cert. denied,* — U.S. —, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993); *but see Overland Express, Inc. v. ICC,* 996 F.2d 356, 360–61 (D.C.Cir.1993) (holding ICC cannot retroactively declare that a tariff is not effectively on file based on procedural defect). Thus, because the court is not precluded by the filed rate doctrine or other provisions in the ICA from ruling on interpretive issues concerning a carrier's filed tariffs, we will deny North Penn Transfer's motion to strike Victaulic's second, seventh, and eighth affirmative defenses.

 We also decline to strike Victaulic's fourth affirmative defense and counts two and three of the counterclaim, which are based upon the theory that the carrier's attempt to collect more than the agreed-upon rates is an "unreasonable practice" proscribed by the ICA. Although the Supreme Court in *Maislin* specifically eliminated a shipper's "unreasonable practice" defense, *see* 497 U.S. at 133, 110 S.Ct. at 2769, Congress resurrected it in the 1993 Rates Act. Section 2(e)(1) of that Act provides in relevant part:

[I]t shall be an unreasonable practice for a motor carrier ... to attempt to charge or to charge for a transportation service provided before September 30, 1990, the difference between the applicable [filed] rate ... and the negotiated rate for such transportation service if the carrier ... is no longer [operating as an interstate carrier].

Since the issue of whether North Penn Transfer is still an operating carrier can be resolved only after factual investigation, and because some of the shipments in question may have been made before September 30, 1990, the "unreasonable practice" defense and related counterclaims, including claims of misrepresentation and abuse of process, are appropriately raised here.

 The fifth affirmative defense, that North Penn Transfer committed unlawful discrimination in violation of 49 U.S.C. § 10741, is legally valid and appropriately raised as an affirmative defense. *See Reiter,* — U.S. at —, 113 S.Ct. at 1219 (claims and defenses specifically accorded by the

ICA are not precluded); *Maislin,* 497 U.S. at 128, 110 S.Ct. at 2766 (a rate the ICC finds discriminatory is unlawful and unenforceable); *see also Indiana H. B. R. Co. v. Industrial Scrap Corp.,* 672 F.Supp. 1041, 1042 (N.D.Ill.1986) (unreasonableness and discriminatory nature of tariff appropriate affirmative defenses).

The court, however, does strike Victaulic's sixth affirmative defense, that this court lacks subject matter jurisdiction. A carrier's action to collect on a tariff rate is appropriately raised in a civil action. *Reiter,* —— U.S. at ——, 113 S.Ct. at 1217. It is true that a tariff rate that the ICC finds unreasonable or discriminatory is unenforceable by a carrier, *see Maislin,* 497 U.S. at 128, 110 S.Ct. at 2766, and that the ICC has primary jurisdiction to make the reasonableness determination, *see Reiter,* —— U.S. at ——, 113 S.Ct. at 1220. Simply raising the unreasonableness issue, however, does not foreclose a civil action to collect the filed rate. *Id.,* —— U.S. at —— – ——, 113 S.Ct. at 1220–21.

Furthermore, the doctrine of primary jurisdiction is a doctrine of deference and not a doctrine of exclusivity of jurisdiction. *Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 303–304, 96 S.Ct. 1978, 1986–87, 48 L.Ed.2d 643 (1976); *Cheyney State College Faculty v. Hufstedler,* 703 F.2d 732, 736–37 (3d Cir.1983). Thus, whether the collection practices are unlawful or are based on the implementation of an unlawful tariff rule are not matters for the exclusive jurisdiction of the ICC, but may be reviewed by the court after the ICC exercises its primary jurisdiction. *Reiter,* —— U.S. at ——, 113 S.Ct. at 1220 (primary jurisdiction is doctrine applicable to claims properly cognizable in a court but which contain issues within special competence of administrative agency; court may retain jurisdiction).[6] Therefore, we will strike Victaulic's sixth affirmative defense.

We will also strike Victaulic's ninth and tenth affirmative defenses, based on the equitable theories of waiver and laches. As discussed above, equitable defenses to the collection of freight undercharges are barred by law. In *Maislin,* the Supreme Court stated that it "has read [the ICA] to create strict filed rate requirements and to forbid equitable defenses to collection of the filed tariff." 497 U.S. at 127, 110 S.Ct. at 2766; *see also United States v. Western Pac. R. R. Co.,* 352 U.S. 59, 76 & n. 20, 77 S.Ct. 161, 171 & n. 20, 1 L.Ed.2d 126 (1956) (estoppel defense not available to private shipper to prevent carrier from collecting higher tariff rate than quoted by carrier).

We further find that Victaulic's eleventh affirmative defense, based on the three-year statute of limitations set forth in 49 U.S.C. § 11706, is properly pleaded as a defense. The Bankruptcy Code extends for two years from the order for relief in a bankruptcy proceeding the time within which a debtor-in-possession may file any cause of action on behalf of an estate. *See* 11 U.S.C. § 108(a)(2) (extends time trustee may bring an action); 11 U.S.C. § 1107 (debtor-in-possession has same rights and authorities as a trustee). The complaint in this case does not specify the dates the shipments were made, rather it sets forth only the dates of the original bills. The earliest date provided is February 13, 1989. Although the bills fall within the extended statute of limitations, the dates of the bills do not establish the dates of the shipments upon which North Penn Transfer seeks to recover. The statute of limitations is therefore an issue appropriately raised and resolved after further factual investigation. Victaulic's eleventh affirmative defense fairly presents a question of law and fact which cannot be decided at this point in the litigation.

Finally, Victaulic's twelfth affirmative defense is that the complaint fails to state a cause of action. Regardless of the filed rate doctrine, this defense is clearly appropriately asserted in the responsive pleading. *See* Fed.R.Civ.P. 12(b). We,

---

**6.** Even section 8 of the 1993 Rates Act, which mandates that the ICC resolve the issue of contract versus common carriage, does not remove the court's original jurisdiction. Such jurisdiction is preserved in section 9 of the Act, so the court can make a final ruling on undercharge claims. The ICC's determination is still subject to deferential review by the court to determine whether or not to enforce the ruling. *See* 28 U.S.C. § 1336(b).

therefore, deny the motion to strike Victaulic's twelfth affirmative defense.

## IV. CONCLUSION

For the foregoing reasons, the court will dismiss defendant's sixth, ninth, and tenth affirmative defenses. The court will deny the motion to strike with respect to the remaining affirmative defenses and counterclaim. The court also finds that the resolution of the contract carriage issue should be decided by the ICC. Because there is no direct mechanism through which the court can order a referral to the ICC, however, we will simply advise defendant to file a petition promptly with the ICC regarding this issue. The court will also direct the parties to further brief the issues of (1) whether the court should make an initial determination of the possibility that the ICC could further decide if North Penn Transfer's filed rates are unreasonable and (2) whether the alternative dispute resolution procedures of the 1993 Rates Act, section 2(a) (codified at 49 U.S.C. § 10701(f)) apply to this action. All other aspects of this case will be stayed pending initial review of the ICC and this court's review of the limited aforementioned issues which the parties are directed to brief.