### In re FRIEDMAN'S EXPRESS, INC., Debtor.

### FRIEDMAN'S EXPRESS, INC., Plaintiff,

v.

### SKF USA, INC., d/b/a CR Services and CR Industries, Defendant.

Bankruptcy No. 93–21066T.

Adv. No. 94–2326.

United States Bankruptcy Court, E.D. Pennsylvania.

April 19, 1995.

---

Joseph L. Steinfeld, Jr., Shawn, Mann & Neidermayer, Washington, DC, John T. Carroll, III, Swartz, Campbell & Detweiler, Philadelphia, PA, for plaintiff/debtor.

Theodore F. Claypoole, Gamble Hartshorn Alden, Columbus, OH, Allen G. Belenson, King of Prussia, PA, for defendant.

## *OPINION*

THOMAS M. TWARDOWSKI, Bankruptcy Judge.

Presently before the Court are two Motions for Summary Judgment filed by Defendant SKF USA, Inc., d/b/a CR Services and CR Industries ("SKF"). In the first motion ("Motion I"), SKF seeks summary judgment against debtor/plaintiff, Friedman's Express, Inc. ("Debtor"), on the ground that Debtor lacks standing to bring the freight undercharge claims asserted in the complaint. In the alternative, SKF requests referral of Debtor's interstate claims to the Interstate Commerce Commission ("ICC") under the doctrine of "primary jurisdiction." SKF also requests referral of Debtor's intrastate claims to the Pennsylvania Public Utilities Commission ("PUC"). In the second motion ("Motion II"), SKF seeks summary judgment against Debtor on the ground that Debtor's claims are barred by the doctrines of accord and satisfaction and compromise and settlement.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over the parties and subject matter of this core proceeding pursuant to 28 U.S.C. §§ 1334, 157(a), 157(b)(1), 157(b)(2)(A), (E) and (O).

## BACKGROUND

The following facts do not appear to be in dispute.

Debtor is a motor freight company existing under the laws of the Commonwealth of Pennsylvania, and is engaged in the business of transporting freight in both interstate and intrastate commerce. On April 6, 1993, Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1330 ("Code") in the Bankruptcy Court for the Eastern District of Pennsylvania ("Court"). Debtor has continued in the possession of its assets and management of its business as a debtor-in-possession pursuant to Code §§ 1107(a) and 1108, 11 U.S.C. §§ 1107(a), 1108.

During the period from 1990 through 1993, SKF was a customer of the Debtor. While a customer, SKF tendered shipments to Debtor for transportation in both interstate and intrastate commerce. Debtor alleges that an audit of its freight bills, conducted on its behalf by Trans–Allied Audit Co., Inc. ("Trans–Allied"), revealed that the freight charges which were previously invoiced to and paid by SKF were at rates which were lower than those Debtor was required to charge customers according to the applicable tariffs that Debtor had on file with the ICC. Debtor also contends that the audit revealed that the previous bills did not comply with applicable provisions of state law for goods shipped in intrastate commerce. Debtor alleges that as a result of the audit, it was determined that a balance in the amount of $225,495.11 was due from SKF for freight undercharges, penalties and interest. SKF was billed this amount by Trans–Allied, but SKF refused to tender payment. Accordingly, Debtor filed this complaint on September

26, 1994 to collect these sums. Debtor asserts that because ICC regulations do not permit a shipper to charge rates lower than those which are on file with the ICC, e.g., the "filed rate doctrine," Debtor is authorized to collect the freight "undercharges," or the difference between the previously charged rates and the filed rates applicable to the materials shipped.

On October 20, 1994, SKF filed an Answer to the Complaint in which SKF lists twenty one affirmative defenses to Debtor's claims and asserts a four count counterclaim against Debtor. In its counterclaim, SKF essentially seeks recoupment of any amounts for which it may be found liable to Debtor, plus costs and fees incurred in defending this action. While SKF admits that Debtor provided it with freight hauling services, SKF specifically denies owing any money to Debtor. Rather, SKF alleges that Debtor billed SKF at the rates the parties previously negotiated, and that SKF paid all the freight bills in full prior to the commencement of this proceeding. SKF contends that Debtor is seeking to rescind the parties' negotiated rate and is attempting instead to collect an unlawful or illegal rate for the previously rendered services. In addition, SKF alleges that some or all of the goods tendered to Debtor were shipped according to Debtor's authority as a "contract carrier" under ICC regulations, and therefore, Debtor's filed rates do not apply. Debtor filed an answer to SKF's counterclaim generally denying all of the allegations contained therein.

Prior to the filing of this adversary complaint, the parties negotiated a settlement of the undercharge claims ("Settlement"). SKF contends that the Settlement resolved all of the claims pending in this adversary case in consideration for a settlement payment of $14,000.00. It is undisputed that SKF made this payment on or about April 12, 1994, and that Trans–Allied, Debtor's agent, deposited the proceeds of the settlement check into Debtor's account on or about April 13, 1994. However, Debtor contends that the release it drafted as part of the settlement was altered by SKF without Debtor's permission or knowledge, and that this alteration substantively changed the release by including with-in it additional claims Debtor did not intend to compromise for the same $14,000.00 payment. On or about April 19, 1994, Debtor attempted to return the settlement payment to SKF by issuing SKF its own check in the amount of $14,000.00. SKF refused to accept the return of the funds and has insisted that all claims were settled pursuant to the agreement.

## DISCUSSION

### Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), applicable here pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P."), summary judgment is proper when the record before the court, including any relevant pleadings, depositions, answers to interrogatories and admissions, together with any affidavits, show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986).

On a motion for summary judgment the court's role is to determine "whether there is a genuine issue [of fact to be determined at] trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. In this regard, only facts that may affect the outcome of the cases are considered "material". *Id.* at 255, 106 S.Ct. at 2513. The moving party has the initial burden of demonstrating the absence of any genuine issues of fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) and the evidence in the record is to be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, if the non-moving party fails to adduce sufficient evidence in connection with an essential element of the case for which it bears the burden of proof at trial, then the moving party is entitled to summary judgment in its favor as a matter of law. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *J.F. Feeser, Inc. v. Serv–A–Portion*, 909 F.2d 1524, 1531 (3rd

Cir.1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991).

*MOTION II:*

The Court will first consider Motion II since a determination favorable to SKF on the issues raised therein would eliminate the need to consider the issues raised in Motion I.

In support of the motion, SKF argues that the parties negotiated a settlement of the outstanding freight undercharges claimed to be due from CR Industries, Inc. ("CR Industries") (a company acquired by SKF on or about March 8, 1990), reduced their agreement to a writing, executed the written agreement and that Debtor accepted the contemplated settlement payment in satisfaction of all of the disputed claims. SKF contends that execution of the agreement and payment of the settlement amount constituted a valid contract to compromise and settle Debtor's claims and further, that Debtor's acceptance of the settlement payment constituted an accord and satisfaction of the disputed debt. SKF asserts that Debtor is now bound by its actions and is therefore, barred as a matter of law from maintaining this action to collect the alleged freight undercharges.

■ It is a well established principle that the law generally favors the settlement of disputes by the parties themselves. *See generally Greentree Cinemas, Inc. v. Hakim,* 289 Pa.Super. 39, 432 A.2d 1039, 1042 (1981). Thus, pending legal claims may generally be compromised and settled pursuant to a valid contract of settlement negotiated by the parties. *See School Dist. of Phila. v. Framlau Corp.,* 15 Pa.Cmwlth. 621, 328 A.2d 866 (1974); *Sanders v. Lawn Mutual Ins. Co.,* 194 Pa.Super. 491, 168 A.2d 758, 760–61 (1961). A disputed debt might also be resolved by accord and satisfaction.

■ An accord and satisfaction is generally defined as the discharge of a demand for payment "by the giving and acceptance of something different from, or less than, that

to which the creditor is entitled." *Shipping Corp. of India, Ltd. v. Sun Oil Co.,* 569 F.Supp. 1248, 1260 (E.D.Pa.1983). It is well established that the essential elements of an accord and satisfaction are: *a)* a disputed debt; *b)* a clear and unequivocal offer of payment in full satisfaction of the debt; and *c)* acceptance and retention of payment by the offeree. *T.J. Trauner Assoc., Inc. v. Cooper–Benton, Inc.,* 820 F.2d 643, 645 (3rd Cir.1987); *Goodway Marketing v. Faulkner Adv. Assoc., Inc.,* 545 F.Supp. 263, 266 (E.D.Pa.1982) (citing *Law v. Mackie,* 373 Pa. 212, 95 A.2d 656 (1953)). While a valid contract of settlement is immediately effective and enforceable, an accord is not effective unless or until it is actually executed by the parties.[1] 1 P.L.E., *Accords and Compromises,* § 2, p. 57 (1986).

■ An accord and satisfaction is contractual in nature. *Shipping Corp. of India,* 569 F.Supp. at 1259; *Hayden v. Coddington,* 169 Pa.Super. 174, 82 A.2d 285, 286–87 (1951). Consistent with the principles of contract formation, in order to prove the existence of an accord and satisfaction one must establish the following elements: *a)* a meeting of the minds; *b)* consideration; and *c)* an intention on the part of the parties to compromise the claim. *See T.J. Trauner Assoc.,* 820 F.2d at 645; P.L.E., *Accord and Satisfaction, supra,* § 2, at p. 55. The burden of establishing each and every element of the defense of accord and satisfaction is on the party asserting it. *Shipping Corp. of India,* 569 F.Supp. at 1259–60; *Suits v. Aetna Casualty and Surety Co.,* 106 Pa.Super. 231, 161 A. 592 (1932). Since the foregoing elements are essential to contract formation, the failure to prove the existence of any one of them is fatal to a party's claim that a debt was satisfied by virtue of an accord and satisfaction.

■ Just as with any other contract, a compromise and settlement, or an accord and satisfaction, may be set aside or reopened upon a proper showing that it resulted from fraud, misrepresentation, duress, imposition,

---

**1.** The term "accord" has also been defined as a contract (not merely a revocable offer or a bargain invalid for lack of sufficient consideration or any other reason) between creditor and debtor for settlement of a claim by some performance other than that which is due. *See generally* 1 P.L.E., *Accords and Compromises,* § 2 n. 10 (1986). "Satisfaction" occurs when the accord is performed. *Id.*

or mistake. *See e.g. Greentree Cinemas,* 432 A.2d at 1041.

In the case before us, a review of the record presented by the parties reveals that issues of material fact exist which preclude entry of summary judgment in favor of SKF on the ground that Debtor's claims are barred by virtue of an accord and satisfaction or a compromise and settlement. As noted above, an essential element of either an accord and satisfaction, or a compromise and settlement, is that the parties must have reached a meeting of the minds with respect to the identity of the claims to be settled. In this regard, SKF contends, and has offered proof in the form of an affidavit from its in house counsel who is alleged to have participated in the settlement negotiations, that it negotiated for a release of all claims relating to CR Industries, including those relating to CR Services. Debtor, however, disputes that it agreed to settle all of its outstanding claims against CR Industries for the sum of $14,000.00. To the contrary, according to the affidavit of Debtor's negotiator, Thomas E. Peterson, attached as Exhibit 1 to Plaintiff's Response ("Peterson Affidavit"), Debtor negotiated the settlement of the only outstanding account due from CR Industries, which was invoice FXIT 1800 in the amount of $34,584.46. SKF does not dispute this assertion. Instead, SKF asserts only that Debtor never disclosed during the course of the negotiations that there was another separate outstanding account due in the name of CR Services in the amount of $100,221.61.[2] SKF suggests that Debtor may have been withholding this fact from SKF until Debtor obtained an agreement to settle the smaller account first. SKF fails to explain how Debtor might have gained by such a dubious negotiation tactic. Additionally, Debtor's assertions concerning the claims it believed were to be compromised and settled, which are supported by the affidavit of Peterson, are not inconsistent with the language of the original settlement agreement Debtor signed and provided to SKF for execution. To wit, Debtor has credibly supported its allegation that while it intended to release all claims it held against CR Industries, it did not intend to release any claims it held against CR Services. *See* Peterson Affidavit.

Further, SKF's argument that because Debtor executed the agreement, it is bound by its terms, would not entitle SKF to judgment in its favor as a matter of law. To explain, Debtor executed the agreement prior to its delivery to SKF. It is undisputed that Debtor did not see the changes, upon which SKF relies, until after the agreement had been altered and signed by SKF, and that Debtor acted promptly upon learning of the changes to repudiate the alleged deal by refunding the payment to SKF. That SKF refused to accept the return of the payment does not lock Debtor into a compromise of claims to which it did not agree. Moreover, the proof submitted by Debtor amply demonstrates that Debtor may have had in mind the settlement of different claims than those which SKF asserts were settled. Finally, SKF's argument that it did not substantively change the agreement by making the name change is disingenuous since SKF relies on the change to support its contention that the CR Services claim is included in the settlement.[3]

In conclusion, upon review of the record before the Court, it is clear that Debtor has provided sufficient proof to demonstrate that a material question of fact exists regarding which claims were intended by the parties to be compromised. Accordingly, SKF's motion for summary judgment based upon the theories of accord and satisfaction and compromise and settlement must be denied.

*MOTION I:*

In Motion I, SKF asserts that Debtor lacks standing to pursue the undercharge claims because Debtor may not recover un-

**2.** According to a letter from Peterson to Mr. Orley Cain of CR Industries dated April 19, 1994 (attached as part of Exhibit 1 to Plaintiff's Response), Debtor had undercharge claims against CR Services in the amount of $100,221.61 and against SKF Industries, Inc. in the amount of $1,515.56.

**3.** Perhaps if the Settlement Agreement had been more carefully drafted to specifically indicate the claims and account numbers to be compromised, the parties could have spared themselves the inconvenience of now having to litigate this issue.

dercharges based on the repudiation of a rate it has on file with the ICC. Alternatively, SKF requests that any of the claims not dismissed be referred to the ICC and the PUC for review. SKF asserts that these administrative agencies have primary jurisdiction over the claims and defenses asserted in this case.

■ This case represents one of several different types of "undercharge claims" frequently brought in the bankruptcy context either by bankruptcy trustees or debtors-in-possession.[4] Here, Debtor seeks to recover from SKF the difference between what it alleges were the filed rates at the times in question, and the lower, unfiled rates which it alleges were mistakenly used when it billed SKF. Hence, Debtor is not seeking to "repudiate" filed rates. To the contrary, Debtor is attempting to collect payments allegedly due from SKF based upon the filed rates. Accordingly, SKF's argument regarding Debtor's standing to challenge the lawfulness of the filed rates is not implicated. Accordingly, this part of SKF's motion for summary judgment shall be denied.

*Filed Rate Doctrine*

■ The filed rate doctrine provides that a motor common carrier may not charge or receive compensation from a shipper different from that which is specified in a tariff filed by the carrier with the ICC.[5] *See White v. United States,* 989 F.2d 643, 646 (3rd Cir.1993); *Louisville & Nashville R. Co. v. Maxwell,* 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915); 49 U.S.C. § 10761(a).[6] In strictly construing the doctrine, *see Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 126–28, 130, 110 S.Ct. 2759, 2765–66, 2768, 111 L.Ed.2d 94 (1990), shippers are

deemed to have constructive notice of filed tariffs, *Security Services, Inc. v. K Mart Corp.,* 996 F.2d 1516, 1523 (3rd Cir.1993), *cert. granted,* —— U.S. ——, 114 S.Ct. 341, 126 L.Ed.2d 306 *aff'd,* —— U.S. ——, 114 S.Ct. 1702, 128 L.Ed.2d 433 (1994); *F.P. Corp. v. Ken Way Transp., Inc.,* 848 F.Supp. 1181, 1183 (E.D.Pa.1994) ("Ken Way II"), and may be held liable to the carrier for the full filed rate, *see White v. United States,* 989 F.2d at 646, even if the carrier is responsible for misquoting the applicable tariff. *See Maislin,* 497 U.S. at 120, 110 S.Ct. at 2762. Carriers may thus institute actions to recover "undercharges", that is, the difference between the rate that a shipper originally paid for transportation services and the filed rate. *See e.g. Atlantic Trucking Express v. Lee Tire and Rubber Co.,* 1992 WL 19037 (E.D.Pa.1992). The purpose of the filed rate doctrine is to prevent rate discrimination and secret deals favoring one shipper over another. *White,* 989 F.2d at 646.

■ In contrast, "motor *contract* carriers" are exempt from the filed rate doctrine. *Ken Way II,* 848 F.Supp. at 1183; 49 U.S.C. § 10761(b). The term motor contract carrier is defined as:

(B) a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more person—

(i) by assigning motor vehicles for a continuing period of time for the exclusive use of such person; or

(ii) designed to meet the distinct needs of such person.

49 U.S.C. § 10102(16)(B).

In the case before us, SKF alleges that it paid in full the amounts previously charged

---

**4.** An example of another type of under undercharge claim is where the carrier asserts it wrongfully provided services pursuant to "contract carriage" rules and then subsequently seeks to collect an applicable filed rate. *See generally White v. U.S.,* 989 F.2d 643, 646–47 (3rd Cir. 1993).

**5.** The Interstate Commerce Act requires motor common carriers to publish their rates in a tariff filed with the ICC. 49 U.S.C. § 10762.

**6.** 49 U.S.C. § 10761(a) provides:
Except as provided in this subtitle, a carrier providing transportation service subject to the

jurisdiction of the Interstate Commerce Commission under chapter 105 of this title shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter. That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that the affects the value of that transportation or service, or another device.

by Debtor for the transportation services it was provided. Further, SKF asserts that the rates it paid were those that it had previously negotiated with Debtor and that Debtor was operating as a contract carrier when it negotiated the rates with SKF. Accordingly, SKF argues that it is not liable to Debtor for any charges which fell below Debtor's filed tariff rate. SKF also argues that if any of its prior shipments were found to be subject to Debtor's filed tariffs, that the filed tariffs are unreasonable and not enforceable. In this regard, SKF asserts that filed tariffs must be reviewed for reasonableness by the ICC.

*Primary Jurisdiction*

The determination of whether a carrier transported goods as a "contract carrier" and the question of whether a filed rate was unreasonable, and therefore not subject to enforcement, *see Maislin*, 497 U.S. at 128, 133, 110 S.Ct. at 2766, 2769, lie within the "primary jurisdiction" of the ICC. *See F.P. Corp. v. Ken Way Transp., Inc.*, 821 F.Supp. 1032, 1037 (E.D.Pa.1993) ("Ken Way I").

The doctrine of primary jurisdiction applies in situations where although a claim is originally cognizable in the courts, "enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pacific R.R.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). Primary jurisdiction merely requires a court to suspend a proceeding pending before it so that the matter might be referred to an appropriate administrative body. *Ken Way I*, 821 F.Supp. at 1036. The ICC is the administrative agency charged by Congress with expert skill and knowledge within the interstate transportation industry. *Ken Way II*, 848 F.Supp. at 1185. In *Reiter v. Cooper*, — U.S. —, —, 113 S.Ct. 1213, 1220, 122 L.Ed.2d 604 (1993), the Supreme Court clarified that referral of an issue to the ICC does not deprive the court of jurisdiction. Rather, when an issue is "referred", the ICC determines only the issues presented to it, e.g. rate reasonableness, but it can not enter judgment against the carrier for a return of

the overcharge since it lacks the authority to do so. *See North Penn Transfer, Inc. v. Maple Press Co.*, 176 B.R. 372, 374 (M.D.Pa. 1995).

To justify a referral of the rate reasonableness issue to the ICC, the shipper must make a threshold showing that the filed rates are unreasonable. *Ken Way I*, 821 F.Supp. at 1038. In the case before us, SKF's undisputed allegation that the filed rate Debtor now seeks to collect is substantially higher than the negotiated contract rate [7] provides sufficient evidence to meet this threshold burden. *See Id.* at 1039. As noted by the Supreme Court in *Reiter v. Cooper*, — U.S. at — n. 3, 113 S.Ct. at 1220 n. 3, however, the term referral is a misnomer because the Interstate Commerce Act does not contain a direct mechanism for the Court to actually demand or request a determination from the ICC. Rather, the most the Court can do is stay further proceedings in this case and advise SKF to file an administrative complaint with the ICC requesting a determination of the contested issues. *North Penn Transfer, Inc. v. Victaulic Co. of America*, 859 F.Supp. 154, 165 (E.D.Pa.1994).

Accordingly, as we find that SKF has made a sufficient threshold showing of rate unreasonableness to justify "referral" of this issue to the ICC, we shall stay the proceedings in this case to give SKF an opportunity to file an administrative complaint with the ICC requesting a determination of the rate reasonableness issue, the contract versus common carrier issue and any other contested issues which lie within the jurisdiction of the ICC. *See Ken Way I*, 821 F.Supp. at 1039.

SKF has also requested referral of Debtor's state undercharge claims to the Pennsylvania PUC, but SKF has not specifically identified which of the shipments were in intrastate commerce and therefore subject to regulation by the PUC rather than the ICC, *see North Penn Transfer, Inc. v. ATD–American Co.*, 175 B.R. 168, 171 (E.D.Pa. 1994); 49 U.S.C. § 10521. However, since the proceedings in this case will be stayed to

---

7. This allegation is supported by reference to Exhibit "A" of the Complaint.

permit administrative review by the ICC of the issues affecting the interstate commerce claims, we shall grant SKF this opportunity to seek administrative review by the PUC of the issues affecting the intrastate commerce claims.

An appropriate order follows.

### ORDER

AND NOW, this 19th day of April, 1995, it is ORDERED that Defendant's motion for summary judgment requesting summary judgment because Debtor allegedly lacks standing to pursue the undercharge claims against SKF is DENIED; and

IT IS FURTHER ORDERED that Defendant's motion for summary judgment requesting summary judgment because the causes of action alleged in the complaint are allegedly barred by the doctrines of accord and satisfaction or compromise and settlement is DENIED; and

IT IS FURTHER ORDERED that Defendant's request that the proceedings in this adversary case be stayed so that Defendant may present various issues raised in the pleadings to the Interstate Commerce Commission ("ICC") and the Pennsylvania Public Utilities Commission ("PUC") is GRANTED; and

IT IS FURTHER ORDERED that Defendant shall, on or before **May 26, 1995,** file an administrative complaint with the ICC requesting a determination of whether Debtor operated as a "contract carrier" with regard to all or some of the shipments handled for SKF, a determination of the reasonableness of the filed tariff Debtor seeks to enforce against SKF, and a determination of any other relevant contested issues that are within the jurisdiction of the ICC; and

IT IS FURTHER ORDERED that Defendant shall, on or before **May 26, 1995,** file an administrative complaint with the PUC seeking a determination of any relevant contested issues that are within the jurisdiction of the PUC; and

IT IS FURTHER ORDERED that the proceedings in this adversary case are placed in a state of civil suspense until decisions are issued by the ICC and the PUC, or until further order of this Court; and

IT IS FURTHER ORDERED that the parties shall file a joint status report, which describes in detail the status of the ICC and PUC proceedings, with this court by **October 23, 1995 and every sixty days thereafter,** until the ICC and PUC proceedings are concluded.

IT IS FURTHER ORDERED that when the ICC and PUC proceedings are concluded, it shall be the **responsibility of the parties to promptly file certified copies of the ICC and PUC decisions with this court and request that the proceedings in this adversary case recommence.**